ATTORNEYS FOR APPELLANTS
Arend J. Abel
Kelley J. Johnson
Cohen & Malad, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
KELLY EUGENE THARP
Julia Blackwell Gelinas
John M. T. Chavis, II
Lucy R. Dollens
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
PAPA JOHN'S U.S.A., INC.
John B. Drummy
Eric D. Johnson
Jeffrey D. Hawkins
Kightlinger & Gray, LLP
Indianapolis, Indiana

_____

## In the
# Indiana Supreme Court



_____

No. 29S02-0901-CV-40

THOMAS WILLIAMS AND SANFORD KELSEY,        *Appellants (Plaintiffs below),*

v.

KELLY EUGENE THARP AND
PAPA JOHN'S U.S.A., INC.,        *Appellees (Defendants below).*

_____

Appeal from the Hamilton Circuit Court, No. 29C01-0510-CT-1146
The Honorable Judith S. Proffitt, Judge

_____

On Transfer from the Indiana Court of Appeals, No. 29A02-0707-CV-625

_____

**October 13, 2009**

**Dickson, Justice.**


This appeal challenges the trial court's grant of summary judgment which found privileged a restaurant employee's statements to a passerby and a police officer that a customer had "pulled a gun" inside the store. The plaintiffs, Sanford Kelsey and Thomas Williams, respectively, the suspected gun carrier and his companion (neither of whom actually had a gun), sued the restaurant operator, Papa John's U.S.A., Inc., and its employee, Kelly Tharp, for a variety of torts (defamation per se, false imprisonment, intentional infliction of emotional distress, negligent hiring, and negligence) seeking damages, including punitive damages. The Court of Appeals re-

versed and remanded for trial.  <u>Williams v. Tharp</u>, 889 N.E.2d 870 (Ind. Ct. App. 2008).  We granted transfer and now affirm the trial court's judgment.

On February 19, 2005, around 9:30 p.m., the plaintiffs drove to a Papa John's restaurant to pick up an order.  Kelsey wore a full-length tan coat and at the front of his waist a rectangular black fanny pack with silver reflective material.  Williams planned to pick up the tab, but inside the restaurant Kelsey contributed by handing cash to Williams, which Kelsey removed from his brown leather bi-fold wallet inside the fanny pack.  Williams accepted the money and paid the bill by credit card.  The men left the store and drove directly home.

Tharp worked that night as a delivery driver.  He had never met and did not know the plaintiffs.  While the plaintiffs were paying, Tharp had come to the front of the store and, according to his deposition testimony, "saw a guy at the counter, and he was looking down . . . , and he pulled out what I thought was a gun."  Tharp said the man "looked up . . . . He didn't move his head, he moved his eyes, and he saw me looking at him, and he stuck his hand back in his coat."  Tharp "went out the door, and whoever was there, the first person it was . . . I said, we need to watch that guy because I think he had a gun.  He pulled out a gun, and he stuck it back in when he thought – when he saw me looking at him."  The passerby called police.  Meanwhile, Tharp returned inside and told another restaurant employee, Christian Martin, that one of the customers had a gun.  Martin walked to the front of the store and noticed Kelsey's fanny pack but did not see a gun.

The Westfield, Indiana, Police Department dispatched Officer Jeff Frolick to Papa John's "on a report of a person carrying a weapon."  The officer happened to be across the street at the time, so he arrived quickly, but the plaintiffs had already left.  After parking, Officer Frolick spoke with two men in the parking lot—one was Tharp, who falsely identified himself as "Arthur Tharp"; the other was the passerby.  Tharp told the officer that "two black males came into Papa John's Restaurant, one was wearing a long tan coat and he pulled a hand gun out of his waistband or a holster and then put it back into some type of holder."  Tharp gave Officer Frolick the license plate number, which he had written down, and a description of Williams's car.  Frolick relayed this information to dispatch.  Tharp described the weapon as a medium-sized silver gun

with a brown wooden handle with two small silver circles. He told Officer Frolick that he had been standing behind the clerk at the register when he saw the gun. (Later in his deposition Tharp recalled the gun as having a black grip with small silver circles on the handle.) It is undisputed that Tharp never claimed that either plaintiff committed a robbery, made threats, demanded money, or pointed a gun at anyone.

Officer Frolick told Tharp to stay by the police car while he went inside to speak with other employees. None of the three other employees reported that the store had been robbed or that anyone had made threats with a gun or demanded money. Frolick went behind the counter to where he understood Tharp to say he had been standing, but the officer did not think someone standing in that location could see a customer's waist and believed that Tharp, who is shorter than Frolick, could not have seen what he claimed. When Officer Frolick returned outside, Tharp was gone. Tharp explained at his deposition that he fled because he had outstanding warrants and feared arrest once his identity was discovered and that "what I saw was the only motivation. I didn't – I didn't really want to talk to police that night."

After Williams and Kelsey made the short drive to Williams's home and parked, police ordered them out of the car at gunpoint, ordered them to their knees, and handcuffed them, thereafter detaining the men for over an hour while family and neighbors looked on. Police told the men they were investigating a report of someone "flashing a gun around at the Papa John's location" or "pulling a gun out." No officer said they were investigating a robbery. Police found no gun, and the men were released.

Tharp had worked for Papa John's elsewhere twice before. The first stint ended with a firing and a later conviction for theft. He used a false name for his second period of employment, which ended because of his incarceration for fraud stemming from events unrelated to his employment. When hired the third time, he used his father's name, social security number, and driver's license number. After he left the scene on February 19, Tharp did not return to work at Papa John's (he later learned that he was fired). Tharp later returned money to Papa John's that was in his car when he left and penned a letter, maintaining, "I don't care what that Black guy says – he was getting ready to rob the store. Why else put his hand on his gun & start to pull it

3

out[?]"

The plaintiffs sued Papa John's and Tharp, seeking compensatory and punitive damages, alleging that Tharp's statement constituted defamation per se, that the plaintiffs were falsely imprisoned as a result, that Tharp intentionally inflicted emotional distress upon them, and that Tharp's actions were negligent. Papa John's was alleged to be liable under the doctrine of respondeat superior as well as for negligent hiring, retention, and supervision. Papa John's moved for summary judgment, and Tharp joined that motion. Papa John's also moved to strike certain items of evidence that the plaintiffs designated in their opposition to summary judgment, including paragraph 9 of Officer Frolick's affidavit (stating his belief that Tharp could not see a customer's waist from behind the counter) and paragraph 10 (his testimony based on reviewing Papa John's surveillance video), as well as in-car video from Frolick's vehicle and a transcript of that video.

The trial court granted summary judgment on all counts. The court held that a qualified privilege protected Tharp's statements, compelling summary judgment for defamation, as well as for negligence, intentional infliction of emotional distress, punitive damages, and, with no underlying tort, negligent hiring. The court also granted summary judgment on the plaintiffs' claim of false imprisonment, concluding that a false report to police was insufficient to create liability. The trial court granted in part and denied in part Papa John's motion to strike. The court struck the video taken from Officer Frolick's car at the scene as well as paragraph 10 of his affidavit, but declined to strike paragraph 9.[1] The Court of Appeals reversed and remanded on each count. We granted transfer.

A grant of summary judgment is reviewed de novo. N. Ind. Pub. Serv. Co. v. U.S. Steel Corp., 907 N.E.2d 1012, 1018 (Ind. 2009). Drawing all reasonable inferences in favor of Williams and Kelsey, the non-moving parties, summary judgment is appropriate "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the mov-

---

[1] The defendants briefly argue that the "trial court erred in failing to strike this statement from Officer Frolick's declaration/affidavit" because his statement "constitutes an impermissible speculative opinion or conclusion about what someone else observed." Appellee Tharp's Br. at 17 n.4; Appellee Papa John's Br. at 17 n.5. We decline to find that the trial court abused its discretion in this regard.

ing party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). A fact is "material" if its resolution would affect the outcome of the case, and an issue is "genuine" if a trier of fact is required to resolve the parties' differing accounts of the truth, Gaboury v. Ireland Road Grace Brethren, Inc., 446 N.E.2d 1310, 1313 (Ind. 1983), or if the undisputed material facts support conflicting reasonable inferences, Bochnowski v. Peoples Fed. Sav. & Loan Ass'n, 571 N.E.2d 282, 285 (Ind. 1991). If Tharp and Papa John's have "demonstrate[d] the absence of any genuine issue of fact as to a determinative issue," they are entitled to summary judgment unless the plaintiffs "come forward with contrary evidence" showing a triable issue for the trier of fact. Jarboe v. Landmark Cmty. Newspapers of Ind., Inc., 644 N.E.2d 118, 123 (Ind. 1994).

Furthermore, the trial court's judgment arrives on appeal "clothed with a presumption of validity," and the challenging party "bears the burden of proving that the trial court erred in determining that there are no genuine issues of material fact and that the moving party was entitled to judgment as a matter of law." Rosi v. Bus. Furniture Corp., 615 N.E.2d 431, 434 (Ind. 1993) (internal quotation marks omitted). The plaintiffs, the challenging parties in this appeal, present various arguments to support their contention that the trial court erroneously granted summary judgment in favor of Papa John's and Tharp. Reorganized and restated, these contentions assert: (1) the designated evidence creates a genuine issue of material fact as to whether Tharp abused the qualified privilege, precluding summary judgment based on qualified privilege for the plaintiffs' claims of defamation, false imprisonment, intentional infliction of emotional distress, negligence, negligent hiring, and punitive damages; (2) the trial court erred in striking the in-car video and Officer Frolick's observations of the security video, which, if admitted, more clearly demonstrate the existence of a genuine issue of material fact; and (3) the language of the complaint was sufficient to allege the plaintiffs' defamation claim.

## 1. Abuse of Qualified Privilege

The trial court believed that a qualified privilege protected Tharp's statements, and accordingly granted summary judgment in the defendants' favor on the plaintiffs' defamation claim. We agree.

5

A qualified privilege "applies to communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he had a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." Bals v. Verduzco, 600 N.E.2d 1353, 1356 (Ind. 1992) (internal quotation marks omitted). As a defense to defamation, the qualified privilege operates not to "change the actionable quality of the words published, but merely [to] rebut[] the inference of malice that is [otherwise] imputed." Holcomb v. Walter's Dimmick Petroleum, Inc., 858 N.E.2d 103, 106 (Ind. 2006) (internal quotation marks omitted). To merit its protection, "[t]he burden is upon the defendant in the first instance to establish the existence of a privileged occasion for the publication, by proof of a recognized public or private interest which would justify the utterance of the words." Bals, 600 N.E.2d at 1356. Then "the plaintiff . . . has the burden of overcoming that privilege by showing that it has been abused." Id. When speaking of abuse, "the essence of the concept is not the speaker's spite but his abuse of the privileged occasion by going beyond the scope of the purposes for which privilege exists." Holcomb, 858 N.E.2d at 106-07 (internal quotation marks omitted). And "[u]nless only one conclusion can be drawn from the evidence, the question of whether the privilege has been abused is for the jury." Kelley v. Tanoos, 865 N.E.2d 593, 601 (Ind. 2007).

The privileged occasion implicated in this case relates to the public interest in "encourag[ing] private citizens and victims not only to report crime, but also to assist law enforcement with investigating and apprehending individuals who engage in criminal activity." Id. The chief benefit is "enhanced public safety by facilitating the investigation of suspected criminal activity." Holcomb, 858 N.E.2d at 108. Such responsible citizen conduct is also encouraged by law enforcement agencies. The Indianapolis Metropolitan Police Department, for example, instructs the general public as follows:

> If you detect any suspicious activity in your neighborhood or anywhere, call IMPD 911. Do not worry about being embarrassed if your suspicions prove to be unfounded. It is better to think of what could happen if you didn't act.

Indianapolis Metro. Police Dep't, Neighborhood Crime Watch TOOL KIT: A Guide to Starting, Organizing & Maintaining Your Neighborhood Crime Watch 11 (2007). Similarly, a division of the Indiana Department of Homeland Security provides a toll-free phone number, mailing address, and e-mail address to encourage citizens "[t]o report suspicious activity/behavior," and

instructs them to include "[a] description of the activity with as much detail as possible," "[t]he location, date, and time of the activity," and "[a] description of the person(s) involved in the activity." Ind. Intelligence Fusion Ctr. Brochure 1 (2009). The brochure declares, "By remaining observant and vigilant, Hoosiers can help further safeguard their communities. Remember to document suspicious behavior and contact the IIFC immediately!" *Id.* at 2. These materials exemplify the desirable public interest served by citizens' awareness and prompt reporting of suspected criminal activity, even when uncertain.

On the other hand, a reporting citizen may, out of an excess of caution or even for a nefarious purpose, make false accusations, and our citizens' equally valid interest in having reputations untarnished by false imputations of criminal misconduct has been a cornerstone of defamation law for hundreds of years. *See* State ex rel. Lopez v. Killigrew, 202 Ind. 397, 401-02, 174 N.E. 808, 810 (1931).[2] Because of the compelling public interest in encouraging citizens to report suspected wrongdoing, however, the law recognizes a limited defense to civil liability premised on erroneous reports of criminal conduct to police: "[I]t is well established that in Indiana, communications made to law enforcement to report criminal activity are qualifiedly privileged." Kelley, 865 N.E.2d at 600; *see id.* at 599-601 (collecting cases).[3] This Court has also noted protection for communications to private citizens that further the same end: enhancing public safety by facilitating the reporting of crime. *Id.* at 600-01. But the privilege is not without limits: a statement "may lose its privileged character upon a showing of abuse wherein: (1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth." Bals, 600 N.E.2d at 1356.

---

[2] The right of a person to have remedy by due course of law for injury to reputation is also expressly noted in Article 1, Section 12 of the Indiana Constitution.

[3] Some courts hold that statements to law enforcement are absolutely privileged, reasoning that a complaint to police is the first step in a judicial proceeding. *See* Ledvina v. Cerasani, 146 P.3d 70, 74-75 (Ariz. Ct. App. 2006) (collecting cases), *rev. denied*. In Hartman v. Keri, this Court assessed situations in which a qualified or absolute privilege is appropriate. There, this Court found that an absolute privilege should apply to communications to school authorities raising complaints against educators. Hartman v. Keri, 883 N.E.2d 774, 777 (Ind. 2008). In reaffirming that citizens "reporting suspected criminal activity to law enforcement enjoy only a qualified privilege, which subjects them to the risk of retaliatory civil litigation for malicious or unfounded charges," we distinguished the two situations, citing "a diminished need to deter false reporting and a greater need to encourage reporting than exists outside the educational environment." *Id.* at 778.

Against this backdrop, the plaintiffs on appeal do not question that Tharp's statements fell within the privileged occasion mentioned above, but argue that they came forward with evidence which creates genuine issues of material fact as to whether the privilege was abused. Specifically, the plaintiffs do not argue that Tharp was primarily motivated by ill will (he had never met the plaintiffs before), or was guilty of excessive publication (he told only a few people at the restaurant and responded to Officer Frolick's investigation), but argue that they designated evidence to create a genuine issue about whether Tharp made his statement "without belief or grounds for belief in its truth." This leads to two questions: (1) What does it mean to make a statement "without belief or grounds for belief in its truth," and (2) would the designated evidence permit a reasonable jury to conclude that Tharp made the statement "without belief or grounds for belief in its truth"? *Id*.

The parties and the two courts below have disagreed on the answer to the first question. The plaintiffs in their brief define "without belief or grounds for belief" by arguing both that "the evidence shows that Tharp had either lied or had no grounds to believe his accusations are true," and that "there is ample evidence of a deliberate lie, or recklessness." Appellants' Br. at 9, 14. Papa John's, however, maintains that a recklessness standard is foreclosed by this Court's decision in Bals, arguing that Bals "indicates that it is necessary to show something beyond recklessness." Appellee Papa John's Br. at 10 n.3. The trial court, relying on this Courts' decision in Holcomb, applied a recklessness standard but found that "a reckless disregard for the truth is not a reasonable conclusion given the detailed information provided by Tharp." Appellants' App'x at 138. The Court of Appeals, citing an earlier Court of Appeals decision, agreed that "[m]aking statements without belief or grounds for belief has been equated to reckless disregard for the truth or falsity of a statement," but found "ample evidence that gives rise to a genuine issue of fact as to whether Tharp acted with reckless disregard for the truth or was honestly mistaken." 889 N.E.2d at 877 (internal quotation marks omitted).

The confusion is understandable because our own precedents have applied inconsistent standards. Bals is the logical starting point. Before Bals, at least two Court of Appeals opinions had recited the "made without belief or grounds for belief" standard but then found that the plain-

tiff failed even to demonstrate a "reckless disregard for the truth." Bals, 600 N.E.2d at 1356 n.4 (citing Olsson v. Ind. Univ. Bd. of Trustees, 571 N.E.2d 585, 588 (Ind. Ct. App. 1991), *trans. denied*; Ernst v. Ind. Bell Tel. Co., 475 N.E.2d 351 (Ind. Ct. App. 1985)). This was also the standard suggested by the "Restatement (Second) of Torts, § 600, that abuse occurs when one (a) knows the matter to be false, or (b) acts in reckless disregard as to its truth or falsity." *Id.* (internal quotation marks omitted). In Bals, however, this Court interpreted "made without belief or grounds for belief" by "depart[ing] from the standard suggested in [the] Restatement" and approving instead "a broader latitude to be given by the qualified privilege." *Id.* Bals itself thus provides strong support for the idea that making a statement "without belief or grounds for belief" requires knowledge that the privileged material was false, a standard this Court appeared to apply as recently as Kelley v. Tanoos, when we rejected the plaintiff's argument that the defendant "did not believe the alleged defamatory statements." 865 N.E.2d at 601-02. On the other hand, this Court and the Court of Appeals have since Bals occasionally utilized a reckless disregard for the truth standard. In May v. Frauhiger, for example, the Court of Appeals, citing one of the Court of Appeals opinions disapproved of in Bals, stated that "[t]he act of making statements 'without belief or grounds for belief' has been equated to reckless disregard for the truth or falsity of a statement." 716 N.E.2d 591, 595 (Ind. Ct. App. 1999). And in Holcomb, we found a defendant's mistaken report to police to be qualifiedly privileged partly on the conclusion that the defendant's actions could not be "attribute[d] to recklessness." 858 N.E.2d at 108.

The scope of the qualified privilege is not amenable to a fixed or precise definition and must adapt to current societal interests and particular situations. We embrace the "broader latitude" described in Bals as to the qualified privilege applicable to communications made to law enforcement, finding that a recklessness standard is ill-suited to this aim. A reckless-disregard state of mind would subject a person reporting criminal conduct to liability not only when the speaker actually knew the statement was false but also when if it could be shown that the speaker *should have known* the statement was false.

This higher degree of caution in applying the qualified privilege defense would substantially impair the public good served by fostering citizens to be vigilant and promptly to report suspected criminal activity. A qualified privilege defense to defamation will shield the reporting

citizen from liability for a false report unless the speaker has abused the privilege by exceeding "the scope of the purposes for which the privilege exists." Elliot v. Roach, 409 N.E.2d 661, 673 (Ind. Ct. App. 1980) (internal quotation marks omitted). Here the law seeks to "encourage private citizens and victims not only to report crime, but also to assist law enforcement with investigating and apprehending individuals who engage in criminal activity." Kelley, 865 N.E.2d at 601. If this purpose is to be met, the privilege must offer a robust defense against liability. Protecting unverified and even speculative reports of suspected wrongdoing to law enforcement is, in our view, supported by ample reasons of social advantage. It is important that citizens not opt for inaction, chilled from communicating with police in all but the most certain of situations. "[P]ersons who suspect criminal activity," this Court has said, should not be "reluctant to provide specific (*or even speculative*) information to law enforcement because of the risk of exposing themselves to civil liability." Holcomb, 858 N.E.2d at 108 (emphasis added). Moreover, requiring citizens to evade civil liability only by first verifying their suspicions with certitude before reporting them to police raises other significant concerns, including vigilante justice and personal safety, in addition to the risk that leads will grow stale by the time citizens have sufficiently verified what they thought they saw. The better rule, it seems to us, is one that fosters open communication between citizens and law enforcement, leaving the task of investigating that information, and of deciding upon the appropriate response, to trained professionals. The "broader latitude" identified in Bals supports rejecting a "reckless disregard" as sufficient to show that a statement was made "without belief or grounds for belief in its truth."

On the other hand, "there is no social advantage to the publication of a deliberate lie." Weenig v. Wood, 169 Ind. App. 413, 438, 349 N.E.2d 235, 250 (1976) (internal quotation marks omitted). Indeed, a deliberate lie in this context imposes significant costs and plainly exceeds "the scope of the purposes for which the privilege exists." Elliot, 409 N.E.2d at 673. A citizen who reports wrongdoing to police knowing that the information is faulty fails to earn protection against a later civil action. But merely arguing about what the speaker should have known is insufficient to show that the speaker made a statement "without belief . . . . in its truth." Bals, 600 N.E.2d at 1356. As for applying the "no grounds for belief" language to this situation, Bals is best understood as implicitly recognizing that the absence of any discernable basis for the truth of the matter—that something is so obviously mistaken—can serve as circumstantial evidence of

10

a reporting citizen's actual knowledge of falsity.

This leads to the second question: would or could the designated evidence, or the reasonable inferences drawn therefrom, create a genuine issue of material fact regarding whether Tharp made the statement knowing it to be false? The plaintiffs label this "a quintessential issue of fact," Appellants' Br. at 11, and we realize that a defendant's state of mind is ordinarily a question for the jury. *See, e.g.*, Best Homes, Inc. v. Rainwater, 714 N.E.2d 702, 707 (Ind. Ct. App. 1999). Although the facts of this case present a closer question than in Holcomb, we find that the plaintiffs have not designated sufficient evidence to give rise to a genuine issue about whether Tharp made the statement knowing it to be false. Nor was he so obviously mistaken as to support a reasonable inference that he had lied.

In Holcomb, a gas station employee erroneously reported to police that a customer had driven off without paying for his gas. 858 N.E.2d at 105. The employee said the vehicle was a green Jeep and relayed the license plate number. Upon that information, the driver of that vehicle was arrested and charged with theft. *Id.* After the charges were dismissed, the driver sued the employee and the employer for false arrest, false imprisonment, defamation, and abuse of process. *Id.* at 105-06. The trial court granted summary judgment in favor of the defendants, holding that the employee's statements were protected by a qualified privilege. *Id.* at 106. On appeal, the plaintiff argued that the employee abused the privilege because her statement to police was made without belief or grounds for belief in its truth. *Id.* at 107. We disagreed, finding that the attendant did nothing more than detail her version of the facts to police and ask for assistance, leaving it to the officer to determine the appropriate response. *Id.* Evidence that the plaintiff was wrongly identified was insufficient, for "[i]f that were enough, it would swallow the privilege because it is always possible that a defendant intentionally and maliciously targeted a randomly selected victim for false reporting." Holcomb, 858 N.E.2d at 108. And despite evidence contradicting the attendant's claim that she recognized the plaintiff as a regular customer, indicating that the allegedly stolen gas was not pumped until an hour after the plaintiff drove away, and showing that the attendant did not contact police until an hour after the alleged theft, *id.* at 108-09, this Court found that, "[a]lthough there are logical possibilities, we do not think they are supported by the record," *id.* at 108.

In this case, the plaintiffs rely on several items of evidence which they contend gave rise to a genuine issue of material fact regarding whether Tharp made his accusations without belief or grounds for belief in their truth: (1) Officer Frolick's testimony that it was not possible to see what Tharp claimed he saw from where he had been standing; (2) none of the other three employees saw a gun (one of whom explained that Tharp, after having left the store, returned inside while the plaintiffs were still present and reported that he thought Kelsey had a gun); (3) Tharp's admitted record of misconduct, his providing a false name to police, and his flight from the scene; and (4) Tharp's inconsistent descriptions of the gun. Further, the plaintiffs contend that the evidence excluded on the motion to strike would further establish "the fact that Tharp was not merely mistaken, but mendacious." Appellants' Br. at 15.

That no other employee thought Kelsey had a gun fails to defeat the privilege. It bears stating the obvious—in a qualified privilege action, the reporting citizen is necessarily mistaken about what he thought he saw. Inasmuch as liability for defamation does not exist where statements are true, the privilege exists to protect tipsters from liability for making inaccurate reports. Thus, "the issue is not the factual accuracy of the statements." <u>Kelley</u>, 865 N.E.2d at 602. This evidence, at most, shows that other people disagreed with Tharp's belief that Kelsey had a gun, and a person's subjective state of mind is not ordinarily established by majority vote. *See* <u>Bals</u>, 600 N.E.2d at 1357. The plaintiffs cannot show that the privilege was abused by pointing to the fact that other people disagreed with Tharp's belief or that Tharp's belief turned out to be mistaken, especially where as here one coworker reported, "I did notice the grey and black fanny pack on the one gentleman, but as I said before there was no gun vis[i]ble." Appellants' App'x at 197. As in <u>Bals</u>, this evidence does not support a reasonable inference that Tharp actually lacked belief in the truth of his statement that Kelsey had pulled out a gun. "By simply denying the factual content of [the defendant's] reports, or by referring to other evidence disputing such content, [the plaintiff] does not present substantial evidence that [the defendant] had no grounds for belief in the truth of [his] statement." <u>Bals</u>, 600 N.E.2d at 1357. In other words, although others may have disagreed and reached a different conclusion, "[t]he election to make one of two reasonable interpretations does not demonstrate" a knowing disregard for the truth. <u>Burns v. Rice</u>, 813 N.E.2d 25, 36 (Ohio Ct. App. 2004), *appeal denied*.

12

The plaintiffs add that evidence that Tharp left the store and told the passerby about the gun, then went back into the store and told a coworker about the gun, belies any notion that Tharp truly believed the store was about to be robbed. Although this argument was not made below, it similarly misses the point. It is undisputed that Tharp told Officer Frolick only that Kelsey had pulled out a gun and put it back and that he never claimed that either plaintiff committed a robbery, made threats, demanded money, or pointed a gun at anyone (although he expressed a belief in his later letter that he thought the plaintiffs were about to rob the store).

The plaintiffs' argument that Tharp's inconsistent descriptions of the gun proves he had no belief in his statements also fails to create a genuine issue of material fact regarding whether Tharp stated that Kelsey pulled out a gun knowing the statement was false. Appellants' Br. at 12. During his deposition, Tharp described the gun as having "little silver circles on it" and a grip that he thought was black. Appellants' App'x at 191. According to Officer Frolick, Tharp "described the weapon in detail as a medium-sized silver gun with a brown wooden handle and with two small circles on the handle." *Id.* at 195. The slight difference in descriptions does not create a genuine issue for a jury to decide whether Tharp was lying about believing he saw a gun. If the question was whether Tharp lied about whether the gun he thought he saw had a brown or black handle, the plaintiffs' point may have some traction. But with respect to whether Tharp was lying about his belief that Kelsey had a gun, this discrepancy, at best, shows that his recollection was not perfect. A lapse of memory, however, does not equate to knowledge of falsity; Tharp consistently maintained his belief that Kelsey had a gun, and his consistent description was of a silver gun with a dark handle. Nor was this description so far afield from the items Kelsey was actually wearing to allow a fact finder to conclude that Tharp completely lacked grounds for his belief. Tharp's description of the gun was consistent with the description of the fanny pack and wallet Kelsey actually possessed (and with the exemplar photos in the appendix and parties' briefs), indicating that Tharp not only had grounds for his belief but in fact believed that Kelsey had a gun.

The plaintiffs also argue that Tharp's criminal record supports an inference that his actions were the result of a deliberate lie, Appellants' Br. at 12, but we believe that such use of his

13

record to prove he acted in conformity with his criminal past by lying to police constitutes improper propensity evidence. It is true that the designated evidence establishes that Tharp did falsely identify himself as "Arthur" and did flee the scene after detailing his version of events. However, the same uncontradicted designated evidence establishes that Tharp provided a false name because he had applied to this Papa John's using the name "Arthur," knew that he had outstanding warrants, and fled to avoid arrest. Appellants' App'x at 184. While correct, as the plaintiffs suggest, that "evidence of flight is relevant as circumstantial evidence of Defendant's consciousness of guilt," Appellants' Br. at 12 (quoting Maxey v. State, 730 N.E.2d 158, 162 (Ind. 2000)), the undisputed proof here—Tharp's deposition testimony—indicates that Tharp's use of a false name and flight evidenced consciousness of outstanding warrants, not of a deliberate lie regarding his observations of Kelsey. It is not reasonable to infer that he dodged police because he knew he had lied about Kelsey having a gun. What is significant is that Tharp was willing to speak at all, and by doing so, he placed himself at risk for arrest.

The plaintiffs' most compelling piece of evidence that Tharp abused the privilege is Officer Frolick's observation that Tharp could not have seen what he claimed from where he was standing. When taken as true, the officer's statement supports an inference—however slight—that Tharp fabricated his account. On the other hand, it is undisputed that Kelsey was wearing a black and silver fanny pack at his waist containing a brown leather wallet and, while inside the store and while Tharp was working at the front of the store, retrieved money from his wallet. Furthermore, another employee testified to seeing the fanny pack. It is also undisputed that Tharp said Kelsey had an object on or near his waist which was silver and black or brown. As the trial court observed, "[t]he description of the alleged gun fits the characteristics of the fanny pack and the location of the fanny pack is the exact location where Tharp said the gun would be." Tharp otherwise accurately described Kelsey's appearance and apparel, as well as Williams's car and license plate number. As in Holcomb, "[a]lthough there are logical possibilities," all of these factors are too great a coincidence to support a reasonable inference that Tharp invented his detailed and mostly accurate report. See Holcomb, 858 N.E.2d at 107-08. We find that no genuine issue of material fact exists. Whether Tharp's misperception was speculative, negligent, or even reckless, it was not so obviously mistaken to permit a reasonable inference that he lied. The trial court did not err in finding a qualified privilege established as a matter of law, thereby preclud-

14

ing the plaintiffs' claim for defamation.

The plaintiffs also contend that the "same misconduct that prevents the Defendants from relying on qualified privilege also subjects them to liability for False Arrest." Appellants' Br. at 20. But Holcomb teaches that the qualified privilege defense to defamation applies as well to the plaintiffs' claim for false imprisonment. 858 N.E.2d at 106-08. Similarly, as regards the plaintiffs' remaining claims of intentional infliction of emotional distress,[4] negligence,[5] and punitive damages,[6] we find that the qualified privilege applicable to citizen reports of suspected criminal activity prevents, as a matter of sound judicial and public policy, a claimant from succeeding on these claims if the privilege applies. Here it applies.

With no underlying tort, the plaintiffs' claim against Papa John's for negligent hiring necessarily fails. *See* Health & Hosp. Corp. of Marion County v. Gaither, 272 Ind. 251, 260, 397 N.E.2d 589, 595 (1979) (noting "a judgment in favor of an employee requires judgment in favor of his employer when the employer's liability is predicated solely upon the acts of said employee").

Because no genuine issue of material fact exists with respect to the defendants' claim of qualified privilege and the privilege is here established as a matter of law, we conclude that the defendants were entitled to summary judgment as to all of their theories of liability.

---

[4] This Court recognized the tort of intentional infliction of emotional distress in Cullison v. Medley, 570 N.E.2d 27 (Ind. 1991), which we defined as occurring when "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Id.* at 31 (quoting Restatement (Second) of Torts § 46 (1965)).

[5] Generally speaking, "[t]o prevail on a claim of negligence, a plaintiff is required to prove: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach." Ford Motor Co. v. Rushford, 868 N.E.2d 806, 810 (Ind. 2007).

[6] Punitive damages are available only if clear and convincing evidence shows that the defendant "acted with malice, fraud, gross negligence or oppressiveness which was not the result of a mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing." Bud Wolf Chevrolet, Inc. v. Robertson, 519 N.E.2d 135, 137 (Ind. 1988).

## 2. Motion to Strike

The plaintiffs challenge the trial court's exclusion of evidence in ruling on the defendants' motion to strike, contending that this evidence would give rise to a genuine issue of material fact, precluding summary judgment. Appellants' Br. at 15. A trial court's order on a motion to strike is reviewed for an abuse of discretion. Davidson v. Perron, 756 N.E.2d 1007, 1012 (Ind. Ct. App. 2001).

Specifically, the trial court struck in-car video from Officer Frolick's police vehicle and a transcript of that video, as well as Officer Frolick's testimony based on his review of Papa John's in-store surveillance video. After reviewing the security tape, Officer Frolick stated that "Mr. Kelsey's wallet is easily identifiable as a wallet and could not honestly have been mistaken for a handgun." Appellants' App'x at 196. The excluded facts from the in-car video include Tharp's description of the gun, his statements of where the gun would be found, and statements made by Officer Frolick and other Papa John's employees. *Id.* at 210-12; Appellants' Br. at 26. The defendants had challenged the in-car video as inadmissible hearsay and Officer Frolick's testimony based on his review of the surveillance video as speculation.

The plaintiffs contend that the trial court abused its discretion in excluding paragraph 10 of Officer Frolick's affidavit, his statement based on reviewing the in-store video. Appellants' Br. at 27. Although we find that the trial court acted within its discretion in striking this testimony, Ind. Univ. Hosps. V. Carter, 456 N.E.2d 1051, 1057 (Ind. Ct. App. 1983) ("Assertions in an affidavit of conclusions of law or opinions will not suffice."), we also fail to see how this evidence, if considered, does anything other than dispute the factual content of Tharp's belief. Bals, 600 N.E.2d at 1357.

As for the in-car video, the plaintiffs argue that a videotape is admissible if it is of "such clarity that it does not lead to jury speculation as to its contents," that a video itself does not constitute hearsay so long as its contents are otherwise admissible, and that the video here does not constitute hearsay because the statements on the tape constitute statements by a party-opponent under Ind. R. Evid. 801(d)(2)(D). Appellants' Br. at 26 (citing Sharp v. State, 534 N.E.2d 708,

16

712 (Ind. 1989); Pritchard v. State, 810 N.E.2d 758, 760-61 (Ind. Ct. App. 2004)).  Although the defendants now argue that the plaintiffs failed to lay an adequate foundation for this video, *see* Holcomb, 858 N.E.2d at 106 n.2 (affirming the trial court's exercise of discretion in striking a video because the plaintiff failed to lay a foundation), in the trial court they relied exclusively on the hearsay argument.  But even were we to find that the statements made by Tharp and other Papa John's workers on the tape constitute admissions of a party-opponent, while Officer Fro-lick's testimony would not be an admission of a party-opponent and could be properly ignored, we can resolve this issue more cleanly.  The plaintiffs have not demonstrated how this stricken in-car video gives rise to a genuine issue of material fact.  Indeed, the transcript of the material only confirms the undisputed facts, which support a finding of qualified privilege:  Tharp be-lieved that Kelsey, who he described as "very tall," with a "brown long jacket on," had a gun with "brown wood on the handle and two little silver pieces of metal on the handle" that he had "either pull[ed] out of his waistband or a holster," but that he "didn't threaten me."  Appellants' App'x at 210-11.

### 3.  Sufficiency of Complaint to Allege Defamation Claim

The plaintiffs also challenge summary judgment on grounds that the trial court erred in finding that the allegations of the complaint were insufficient to raise a claim for defamation. This contention need not be addressed because our resolution of the other issues is independently dispositive.

### Conclusion

We affirm the grant of summary judgment in favor of the defendants.[7]

---

[7] On March 27, 2009, the plaintiffs filed an application for leave to file a Trial Rule 60(B) motion for re-lief from judgment in the trial court, asserting that the trial court's judgment should be set aside because on June 2, 2008, Tharp pleaded guilty to False Reporting, a class B misdemeanor, in violation of Ind. Code § 35-44-2-2(d)(1).  Inasmuch as there is no apparent justification for the plaintiffs waiting until three weeks after oral argument to file the present application, we reject the application and affirm the trial court's judgment.  The plaintiffs are free to seek relief from the trial court's final judgment under Tri-al Rule 60(B)(8), and the trial court may consider whether such a motion is "filed within a reasonable time" and should be granted.

Shepard, C.J., and Sullivan, J., concur.  Boehm, J., dissents with separate opinion.  Rucker, J., dissents with separate opinion.

**Boehm, Justice, dissenting.**

I respectfully dissent. Although I believe the majority adopts the correct legal standard, I disagree with the majority's view of the facts reasonably inferrable from the designated evidence. Specifically, I agree with the majority that Indiana law confers a broader qualified privilege than some jurisdictions, and requires more than reckless disregard of the truth to support a claim of defamation or false imprisonment based on an inaccurate report to a law enforcement agency of potentially criminal activity. Moreover, for the reasons the majority gives, I agree that it is appropriate to protect citizens from the expense and risks of litigation based on an incorrect report, even if the citizen should have known of the falsity of the report. But here, I believe the facts in the aggregate support the conclusion that Mr. Tharp first recklessly or knowingly made false statements to a private citizen and then knowingly repeated false allegations to law enforcement officers. The statements to the passerby were not subject to any privilege, and their later repetition to the police was privileged only if the statements were not made with knowledge that they were false. Without a qualified privilege, summary judgment as to the claims for defamation and false imprisonment was wrongly granted, and I believe the designated evidence precludes summary judgment on those issues.

The majority separately examines each fact the plaintiffs advance and concludes that none of them is sufficient to overcome the privilege. I believe the majority overlooks some salient facts and the reasonable inferences from the aggregation of these facts. It is not insignificant that Tharp exited the store and told a passerby that one of the plaintiffs had "pulled out a gun," then returned to the store and repeated his claim to a fellow employee, but made no effort to contact the police. The passerby, having no reason to question Tharp's claim, called the police. When an officer arrived in response to the passerby's report, the passerby was still present. If the statements to the passerby were not true, Tharp either had to retract his story or repeat it to the officer. Tharp then misrepresented his name and repeated his allegations to the officer. While the officer was in the store interviewing other employees, only to find that none of them had perceived any problem, Tharp fled.

As the majority observes, it is a jury question whether the privilege has been abused where more than one inference can be drawn from the evidence. Kelley v. Tanoos, 865 N.E.2d 593, 601 (2007). Although Tharp's conduct allows an inference that Tharp was merely mistaken, it supports the inference that Tharp knowingly repeated false accusations. We frequently

note that flight is admissible evidence of guilt in a criminal case. <u>Dill v. State</u>, 741 N.E.2d 1230, 1232 (Ind. 2001). Tharp had already offered inconsistent descriptions of the alleged gun. Tharp now explains he fled because he had outstanding warrants, but his explanation does not preclude an inference that he was concerned his statements might be exposed by further questioning.

In <u>Holcomb v. Walter's Dimmick Petroleum, Inc.</u>, we held that the fact that the report of a store clerk turned out to be false was not sufficient to overcome the privilege. 858 N.E.2d 103, 108 (Ind. 2006). The plaintiffs here point to much more than the simple fact that the plaintiffs were found with no weapon, and support their claim that Tharp knowingly lied with an array of other evidence. They point to Tharp's flight as a tacit recognition of his misstatements, and add to it Tharp's inconsistent descriptions of the alleged gun, his inability to see a gun from where he was standing, his misrepresentation of his identity, and the lack of corroboration for his story. Although any one of these facts in isolation may be insufficient to establish that Tharp knowingly made false allegations, I think it is a fair inference from these facts, taken in the aggregate, that Tharp first recklessly or knowingly defamed the plaintiff by his statement to the passerby that the plaintiffs had taken a step towards an armed robbery, then compounded the problem by repeating the charge to the officer with knowledge that it was false. I reach this conclusion on the basis of the evidence before the trial court, and not on the basis of the plaintiffs' motion after oral argument in this court discussed in footnote 7 of the majority opinion.

I agree with the Court of Appeals that summary judgment in favor of the defendants should be reversed, and this case should be remanded for trial.

2

**Rucker, J., dissenting.**

I agree with Justice Boehm that "the facts in the aggregate support the conclusion that Mr. Tharp first recklessly or knowingly made false statements to a private citizen and then knowingly repeated false allegations to law enforcement officers." Slip op. at 1, (Boehm, J., dissenting). And I do so largely for the reasons Justice Boehm articulates. I write separately however to underscore events occurring after the trial court entered summary judgment in this case and after the plaintiffs filed their notice of appeal that seem to undermine completely Tharp's claim of qualified privilege. On June 2, 2008, Tharp pleaded guilty to three offenses arising out of his employment at Papa John's, one of which was the offense of false reporting. The following excerpts from Tharp's guilty plea hearing are instructive:

> Q. [Trial Court] Count 2 is false crime reporting. And it states in Count 2 that on or about, February 19th, Kelly Eugene Tharp, did give a false report of the commission of a crime, to-wit: male with gun inside of Papa John's Pizza *knowing the report to be false*. Do you understand the allegations contained in those charging information[s], Sir?
>
> A. [Tharp] I do, Judge.

Tr. at 8. (emphasis added)

\* \* \*

> Q. [Trial Court] Do you understand that when you enter a plea of guilty, you are admitting the material facts that I just read to you?
>
> A. [Tharp] Yes, Sir.

Tr. at 9.

\* \* \*

> Q. [Trial Court] How do you plead to Count 2, false [reporting] of B Misdemeanor.
>
> A. [Tharp] I plead guilty.

Tr. at 15.

The majority certainly has acted within its discretion in denying plaintiffs' petition for leave to file a Trial Rule 60(B) motion for relief from judgment, <u>see</u> slip op. at 17 n.7, which would effectively end this appeal. <u>See</u> <u>Logal v. Cruse</u>, 267 Ind. 83, 368 N.E.2d 235, 237 (1977) (holding that during the pendency of an appeal a party seeking to file a T.R. 60(B) motion must file a verified petition with the appellate court seeking leave to file the motion. "If the appellate court determines that the motion has sufficient merit, . . . it will remand the entire case to the trial court for plenary consideration of the 60(B) grounds. Such remand order will terminate the appeal . . . ."). Nonetheless, despite the procedural irregularity of plaintiffs waiting until after oral argument to seek leave to file their petition, this Court should not, in effect, turn a blind eye to evidence that stands at the very heart of this litigation, namely whether Tharp's statements were made without belief or grounds for belief in their truth. His admissions by way of a guilty plea certainly seem to put the matter to rest. At an absolute minimum Tharp's admissions raise a genuine issue of material fact on the issue. In light of what fairly may be characterized as newly discovered evidence surfacing after the trial court entered summary judgment in Tharp's favor, this Court at the very least should reverse the trial court's judgment and remand this cause for further proceedings. For this additional reason I respectfully dissent.